**Case No. 15-17510**
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

CENTER FOR FOOD SAFETY, et al.,
*Plaintiff-Appellants*,

v.

MARGARET HAMBURG, et al.,
*Defendant-Appellees*,

ELANCO ANIMAL HEALTH,
*Intervenor-Defendant-Appellee.*
_____

On Appeal from the U.S. District Court for the Northern District of California
Case Nos. 4:14-cv-04932-YGR, 4:14-cv-04933-YGR
Judge Yvonne Gonzalez Rogers
_____

## BRIEF OF *AMICI CURIAE* ENVIRONMENTAL, ADMINISTRATIVE, AND FOOD LAW PROFESSORS IN SUPPORT OF PLAINTIFF-APPELLANTS

Daniel H. Lutz
Hope M. Babcock
INSTITUTE FOR PUBLIC REPRESENTATION
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Tel: (202) 662-9535
Fax: (202) 662-9634
daniel.lutz@law.georgetown.edu

*Counsel for Amici Curiae* Law Professors          May 17, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

IDENTITIES AND INTERESTS OF THE AMICI ...................................1

SUMMARY OF ARGUMENT ...............................................................2

BACKGROUND ...................................................................................3

    I.    NEPA Requires Environmental Review as Early as Possible
           in Agency Decision-making. .......................................................3

ARGUMENT ........................................................................................6

    I.    FDA Has Displayed a Recurring Inability to Satisfy NEPA. ...................6

    II.    FDA's Citizen Petition Exhaustion Process Does Not
            Provide Adequate Relief of NEPA Claims. ...............................11

        A. FDA did not contemplate NEPA when it developed
           the citizen petition process. ...................................................11

        B. Challenges to initial drug approvals are distinct from
           subsequent requests to withdraw or suspend approvals.......................13

        C. The options available to FDA in response to a citizen
           petition do not sufficiently include NEPA issues. ...............................14

        D. Plaintiffs can obtain relief only via immediate
           judicial review. ....................................................................17

    III.    The District Court's Decision Allows FDA to Continue to
            Violate NEPA without Judicial Oversight. ...............................18

        A. The citizen petition requirement exacerbates the
           environmental review shortcomings inherent in the
           drug approval process..........................................................19

        B. FDA does not incorporate NEPA-related citizen
           petitions into its decision-making process. .........................................22

C.  The delay from FDA's citizen petition barrier allows ecologically risky drugs to remain in the environment........................24

CONCLUSION.........................................................................................26

ADDENDUM ..........................................................................................27

CERTIFICATE OF COMPLIANCE.......................................................29

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Animal Legal Def. Fund v. FDA*,
 2016 U.S. App. LEXIS 6549 (9th Cir. 2016)........................................................7

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
 462 U.S. 87 (1983) ............................................................................................4, 5

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
 449 F.2d 1109 (D.C. Cir. 1971)..........................................................................3, 4

*Citizens for Better Forestry v. U.S. Dept. of Agric.*,
 341 F.3d 961 (9th Cir. 2003) ..................................................................... 4, 19, 21

*Cody Labs., Inc. v. Sebelius*, 446 Fed. Appx. 964 (10th Cir. 2011) ..........................2

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
 349 F.3d 1157 (9th Cir. 2003) ................................................................................5

*Darby v. Cisneros*, 509 U.S. 137 (1993) ..................................................................2

*Envtl. Defense Fund v. Mathews*, 410 F. Supp. 336 (D.D.C. 1976)........................6

*Fones4All Corp. v. Fed. Commc'ns Comm'n*,
 550 F.3d 811 (9th Cir. 2008) ................................................................................17

*Herr v. U.S. Forest Serv.*, 803 F.3d 809 (6th Cir. 2015) ..........................................2

*Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015)......................... 2, 18

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ............................... 18, 19

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)................................... 4, 15, 19, 23

*Natural Res. Def. Council v. FDA*, 760 F.3d 151 (2d Cir. 2014) ...........................16

*Natural Res. Def. Council v. FDA*,
 872 F. Supp. 2d 318 (S.D.N.Y. 2012) ........................................................... 16, 20

*Pub. Citizen v. Heckler*, 602 F. Supp. 611 (D.D.C. 1985)......................................20

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)........................4

*S. Fork Band Council of W. Shoshone of Nev. v. Dept. of Interior*,
588 F.3d 718 (9th Cir. 2009) .......................................................... 24, 26

*Save Our Ecosystems v. Clark*, 747 F.2d 1240 (9th Cir. 1984)...............................5

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) .........................................5

*Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988) ..........................................17

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) .........................17

*WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008) ...........................................19

## FEDERAL STATUTES

21 U.S.C. § 360b .................................................................... 8, 13, 14, 15

42 U.S.C. § 4321 ............................................................................................3

42 U.S.C. § 4332 ............................................................................................7

5 U.S.C. § 706 ..............................................................................................17

## FEDERAL REGULATIONS

21 C.F.R. § 10.30 .........................................................................................20

21 C.F.R. § 10.35 .........................................................................................24

21 C.F.R. § 10.45 ...........................................................................................2

21 C.F.R. § 25.22 ...........................................................................................7

21 C.F.R. § 25.31 ...........................................................................................9

21 C.F.R. § 25.33 ...........................................................................................6

21 C.F.R. § 25.40 ...........................................................................................6

21 C.F.R. § 25.51 ...........................................................................................7

21 C.F.R. § 514.100 .....................................................................................15

21 C.F.R. § 514.111 ........................................................................... 14, 15, 17

21 C.F.R. § 514.115 ........................................................... 14, 15, 17

21 C.F.R. pt. 25 ...................................................................6

21 C.F.R. § 25.52 ........................................................... 7, 15

40 C.F.R. § 1500.1 ...............................................................3

40 C.F.R. § 1501.4 ...............................................................7

**OTHER AUTHORITIES**

40 Fed. Reg. 22,957 (May 27, 1975) ...................................12

44 Fed. Reg. 22,318 (Apr. 13, 1978) ...................................12

62 Fed. Reg. 40,570 (Jul. 29, 1997)................................ 7, 14

66 Fed. Reg. 30,992 (Jun. 8, 2001) .....................................12

76 Fed. Reg. 79,697 (Dec. 22, 2011) .............................. 16, 21

77 Fed. Reg. 76,050 (Dec. 26, 2012) ...................................23

78 Fed. Reg. 3,504 (Jan. 16, 2013) .......................................8

78 Fed. Reg. 50,358 (Aug. 19, 2013) ....................................8

Acknowledgement Letter, FDA to CFS, Dkt. No. FDA-2001-P-0483-0002,
    May 11, 2001, *available at* regulations.gov .......................22

Andrew Revkin, *F.D.A. Considers New Tests for Environmental Effects*,
    New York Times (Mar. 14, 2002) .......................................10

Charles H. Eccleston, The NEPA Planning Process: A Comprehensive
    Guide with Emphasis on Efficiency (1999) ...........................4

Christopher Nidel, *Regulating the Fate of Pharmaceutical Drugs: A New
    Prescription for the Environment*, 58 Food & Drug L.J. 81 (2003) .................8, 9

Diana Winters, *Intractable Delay and the Need to Amend the Petition
    Provisions of the FDCA*, 90 Ind. L.J. 1047 (2015) ...............8

Food & Drug Admin., *Environmental Assessment: Questions and Answers Regarding Drugs with Estrogenic, Androgenic, or Thyroid Activity*, *available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatory information/guidances/ucm444657.pdf...................................................................9

Food & Drug Admin., *Paylean Environmental Assessment*, *available at* http://www.fda.gov/downloads/AnimalVeterinary/Development ApprovalProcess/EnvironmentalAssessments/UCM072246.pdf........................26

Gabriel Eckstein & George William Sherk, *Alternative Strategies for Addressing the Presence and Effects of Pharmaceutical and Personal Care Products in Fresh Water Resources*, 15 U. Denv. Water L. Rev. 369 (2012) ....................................................................9

Gabriel Eckstein, *Drugs on Tap: Managing Pharmaceuticals in our Nation's Waters*, 23 N.Y.U. Envtl. L.J. 37 (2015)..........................................6, 9

Interim Response, FDA to CFS & ALDF, Docket No. FDA-2012-P-1252, Jun. 10, 2012, *available at* regulations.gov..........................................................21

Letter from Michael Taylor, FDA to Paige Tomaselli, Ctr. for Food Safety & David Wallinga, M.D., Inst. for Agric. & Trade Pol'y, Sept. 30, 2013, Dkt. No. FDA-2009-P-0594, *available at regulations.gov*..................................16

Octavia Conerly & Lesley Vazquez Coriano, U.S. Envtl. Prot. Agency, Literature Review of Contaminants in Livestock and Poultry Manure and Implications for Water Quality, EPA 820-R-13-002 (2013), *available at* http://water.epa.gov/scitech/cec/upload/Literature-Review- of-Contaminants-in-Livestock-and-Poultry-Manure-and-Implications- for-Water-Quality.pdf....................................................................................10

Office of Inspector Gen., Dep't of Health & Human Servs., Rep. No. A-15-97-50002, *Review of the Food & Drug Administration's Citizen Petition Process* (Jul. 1998), *available at* https://oig.hhs.gov/oas/reports/phs/c9750002.pdf................................................21

Petition Denial, FDA Office for Policy Response to CFS, Docket. No. FDA-2001-P-0483-0008, Jan. 15, 2009, *available at* regulations.gov ...............23

Petition Denial, FDA to Earthjustice, Docket No. FDA-2011-P-0448, Nov. 19, 2015, *available at* regulations.gov .......................................................23

Petition, CFS & ALDF to FDA, Docket No. FDA-2012-P-1252,
  Dec. 20, 2012, *available at* regulations.gov .......................................................21

Petition, CFS & Inst. for Agric. and Trade Policy, Docket No.
  FDA-2009-P-0594, Dec. 8, 2009, *available at* regulations.gov .........................25

Petition, Ocean Conservancy, *et al*. to FDA, Docket No.
  FDA-2011-P-0448, May 25, 2011, *available at* regulations.gov .......................23

Stip. & Proposed Order to Vacate Case Mgmt. Conf., *Animal Legal
  Def. Fund v. FDA*, 3:13-cv-04622, Dkt. No. 34 (N.D. Cal. 2015).........................7

Susan Schneider, *Beyond the Food We Eat: Animal Drugs in
  Livestock Production,* 25 Duke Envtl. L. & Pol'y F. 227 (2015) ................... 8, 24

Susan Schneider, *Examining Food Safety from a
  Food Systems Perspective*, 2014 Wis. L. Rev. 397 (2014) ...................................25

## IDENTITIES AND INTERESTS OF THE *AMICI*[1]

*Amici* are fifteen professors of environmental, administrative, drug, and food law. *Amici*'s expertise includes scholarship on environmental, food and drug regulatory law, and administrative law. Combined, *amici* have decades of experience teaching these topics. *Amici* have an interest in ensuring that the U.S. Food and Drug Administration adheres to public participation and disclosure requirements for agency decision-making as provided by the National Environmental Policy Act. The list of *amici* law professors and their school affiliations is located in the Addendum.

Counsel for *amici* conferred with counsel for Petitioners, Respondents, and Intervenor-Respondents. All parties consent to *amici* filing this brief.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no party's counsel authored this brief in whole or in part. No party, nor any party's counsel, nor any person other than the *amici curiae* or their counsel contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

This case presents a garden-variety Administrative Procedure Act ("APA") question on the exhaustion of administrative remedies.[2] But the District Court's decision to require citizens to first exhaust their environmental concerns through the Food and Drug Administration's ("FDA") citizen petition process sets a precedent that severely undercuts the effectiveness of the National Environmental Policy Act ("NEPA"). Should this Court affirm the District Court, Plaintiffs and fellow concerned public interest groups and citizens will be forced to wait years in a Kafkaesque process before receiving an agency decision that cannot match the judicial relief that courts award under NEPA, rendering NEPA (and related APA provisions) toothless.

*Amici* submit this brief to suggest how the District Court's administrative exhaustion requirement effectively insulates FDA from NEPA obligations, in contravention of NEPA and administrative law principles. If agencies can develop

---

[2] As Plaintiffs more fully explain in their brief, the District Court erred on two basic APA points. *See* Appellants' Br. 17-25, 33-37. First, APA section 704's exhaustion requirement does not apply here because the FDA regulation at issue, 21 C.F.R. § 10.45(b), does not render the ractopamine drug approvals "inoperative" during agency review of the citizen petition. *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993). Second, the District Court mistakenly held that it did not have discretion to waive the agency-created exhaustion requirement. *See Herr v. U.S. Forest Serv.*, 803 F.3d 809, 822-23 (6th Cir. 2015); *Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4, 10-11 (D.C. Cir. 2015); *Cody Labs., Inc. v. Sebelius*, 446 Fed. Appx. 964, 969 (10th Cir. 2011).

exhaustion regulations, like FDA's citizen petition process, to block judicial enforcement of NEPA, the judiciary's oversight role is at best undermined and at worst obliterated. Taking Plaintiffs' allegations as true, FDA appears to have violated NEPA—a statute predicated on the idea of preventative consideration of irreversible losses, and predicated on searching and public review. And yet, FDA's defense is that Plaintiffs must first engage in an ill-fitting after-the-fact exhaustion process that will take years, while the drug remains on the market. If this argument, embraced by the District Court, is affirmed, then nothing is left of NEPA; agencies may eliminate their NEPA obligations using similar regulatory approaches.

## BACKGROUND

### I. NEPA Requires Environmental Review as Early as Possible in Agency Decision-making.

NEPA is "our national charter for protection of the environment." 40 C.F.R. § 1500.1(a). One of NEPA's main purposes is "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. To fulfill this purpose, NEPA requires agencies to integrate environmental review into their decision-making processes and to consider environmental impacts just as they would consider their own mandates. *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C. Cir. 1971).

While NEPA does not require agencies to select the most environmentally protective option when considering a range of possible actions, NEPA's procedural

requirements are mandatory. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 347 (1989). Courts often step in to correct agencies that shirk procedural requirements and insulate agency actions from public scrutiny. Shortly after NEPA's enactment, the D.C. Circuit affirmed Congress' intent to make NEPA nondiscretionary, holding that NEPA establishes "a high standard for . . . agencies"—all must comply with NEPA procedural requirements. *Calvert Cliffs*, 449 F.2d at 1114; *see also Citizens for Better Forestry v. USDA,* 341 F.3d 961, 970 (9th Cir. 2003).

NEPA requires early and meaningful environmental review by forcing agencies to: (1) carefully evaluate the environmental impacts of proposed actions *before* undertaking the action, and (2) fully advise the public that the agency has considered potential impacts of those actions and of alternatives *during* the agency's decision-making process. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council ("NRDC")*, 462 U.S. 87, 97 (1983); s*ee* Charles H. Eccleston, The NEPA Planning Process: A Comprehensive Guide with Emphasis on Efficiency 59 (1999) ("Success of NEPA depends heavily on whether an agency has reached out to affected parties in collecting information and determining the scope of analysis").

NEPA requires agencies to conduct transparent environmental review as early as possible, *i.e.*, before "making an irreversible and irretrievable commitment of resources." *See Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). Indeed,

prior to undertaking NEPA review, agencies may not commit to a course of action. *See id.* at 1145 (holding that because "the Federal government was predisposed to finding that the Makah whaling proposal would not significantly affect the environment," the agency's initial assessment was "demonstrably suspect").

Merely informing the public of an agency's environmental conclusions, without more, is not enough, and this Court has not hesitated to intervene when an agency fails to include the public in its decision-making. *E.g.*, *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) (rejecting Forest Service use of categorical exclusion for "hazardous fuel activities" on over 5,000 acres of national forest land without considering public comments); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) (holding that agency violated NEPA when it failed to disclose, consider, or address "opposing scientific viewpoints in the final statement"); *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1247 (9th Cir. 1984) (enjoining herbicide spraying program because, in part, agency did not provide an adequate public comment period).

Thus, when an agency ignores or otherwise violates NEPA's procedural requirements, courts must enforce agency compliance with the statute. *See Baltimore Gas*, 462 U.S. at 97 ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious").

5

## ARGUMENT

### I.    FDA Has Displayed a Recurring Inability to Satisfy NEPA.

NEPA applies to FDA. *See* 21 C.F.R. pt. 25; *see also Envtl. Defense Fund v. Mathews*, 410 F. Supp. 336, 337-38 (D.D.C. 1976). But FDA often does not sufficiently evaluate the environmental impacts of its regulatory actions on its own and rarely involves the public in its environmental review. *See* Gabriel Eckstein, *Drugs on Tap: Managing Pharmaceuticals in our Nation's Waters*, 23 N.Y.U. Envtl. L.J. 37, 66 (2015) (describing FDA's secretive reviews as having "substantially neutered" NEPA procedural requirements).

FDA has displayed a recurring failure to meet NEPA's procedural purposes, in the drug approval context. Through a confidential process for approving drugs, FDA allows drug sponsors to either prepare an environmental assessment ("EA") on their own, or advise FDA to apply one of many categorical exclusions ("CEs"). 21 C.F.R. §§ 25.40, 25.33. Granting industry sponsors with vested interests the freedom to decide whether CEs apply allows an "untold number of drugs and related products to circumvent the NEPA process." Eckstein, 23 N.Y.U. Envtl. L.J. at 64. Indeed, the District Court called FDA's internal policy regarding industry use of CEs "troubling." *See* Order on Intervenor-Def.'s Mot. to Dismiss 14, *Ctr. for Food Safety, et al. v. Hamburg, et al.*, 14-cv-04932, 04933, Dkt. No. 90 (N.D. Cal. 2015) [hereinafter "District Court Order"].

Even when FDA does require a drug applicant to prepare an EA, there is virtually no way to involve the public prior to FDA's final approval of the drug.[3] The public learns of a new drug only after FDA notices its approval decision in the Federal Register.[4] 21 C.F.R. §§ 25.51, 52; *see also* 62 Fed. Reg. 40,570, 40,589 (Jul. 29, 1997) (noting that Council on Environmental Quality requirements of public disclosure and collaboration "must give way" to prohibition on disclosing trade secrets and confidential commercial information). And while FDA may allow for public review of draft EAs when a proposed action is like "one that normally requires an EIS," 21 C.F.R. § 25.51(b)(3), review is unlikely because FDA admits, "[t]here are no categories of agency actions that routinely significantly affect the quality of the human environment and that therefore ordinarily require the preparation of an EIS." *Id.* § 25.22(a).

---

[3] FDA's use of confidentiality to shield the animal drug approval decision-making from public participation in its environmental review is not the focus of the instant lawsuit. But *amici* question whether the agency is, in fact, implementing NEPA "to the extent practicable." 40 C.F.R. § 1501.4(b); *see also* 42 U.S.C. § 4332.

[4] Indeed, even when FDA allows for public review *after* drug approval, the agency substantially limits the public's access to information to that which is available under the Freedom of Information Act ("FOIA"). *See* Stip. & Proposed Order to Vacate Case Mgmt. Conf., *Animal Legal Def. Fund ("ALDF") v. FDA*, 3:13-cv-04622, Dkt. No. 34 (N.D. Cal. 2015) (agreement of parties to dismiss FOIA lawsuit after FDA provided ALDF with estimated production completion date of approximately December 2019 for requested ractopamine information); *cf. ALDF v. FDA*, 2016 U.S. App. LEXIS 6549, *3-4 (9th Cir. 2016) (discussing how FDA redacted 277 of 398 pages of egg production records on the basis of "competitive harm").

FDA's closed-door policy for environmental reviews increases the risk that FDA is using biased information. *See* Diana Winters, *Intractable Delay and the Need to Amend the Petition Provisions of the FDCA*, 90 Ind. L.J. 1047, 1050 (2015). Animal drug approvals are made pursuant to information provided in the drug sponsor's application. 21 U.S.C. § 360b(a)(4)-(6); *see also* Susan Schneider, *Beyond the Food We Eat: Animal Drugs in Livestock Production,* 25 Duke Envtl. L. & Pol'y F. 227, 255 (2015). Because drug sponsors assess the environmental effects of their own applications, it is unsurprising that EAs nearly always lead to a finding of no significant impact or a CE. *See id.* at 268-69.

With such structural shortcomings, FDA cannot, and therefore does not, fully consider the existence and magnitude of environmental consequences when approving drugs.[5] *See* Christopher Nidel, *Regulating the Fate of Pharmaceutical Drugs: A New Prescription for the Environment*, 58 Food & Drug L.J. 81, 82 (2003) (finding the agency's failure to consider the presence of human and animal drugs in the environment during the approval process as the "root-cause" of the harmful effects of the drugs on the environment); *see also* Gabriel Eckstein &

---

[5] When FDA *does* allow for public participation, the added information improves FDA's understanding of environmental consequences. For example, in 2013, FDA proposed a food handling rulemaking, and categorically excluded the rule from NEPA review. 78 Fed. Reg. 3,504, 3,616 (Jan. 16, 2013). Upon receiving public comment, FDA realized it failed to consider environment effects, such as increased risk of groundwater depletion and implications of increased animal-based fertilizer, and decided to prepare an EIS. *See* 78 Fed. Reg. 50,358 (Aug. 19, 2013).

George William Sherk, *Alternative Strategies for Addressing the Presence and Effects of Pharmaceutical and Personal Care Products in Fresh Water Resources*, 15 U. Denv. Water L. Rev. 369, 439-40 (2012) (contending that consideration of pharmaceutical discharge should be a component of FDA drug approval process).

Moreover, FDA's process for determining whether an applicant must conduct an EA is flawed. With regard to how much of the drug will ultimately enter the environment, the agency sets allowable limits that are often arbitrary, lacking in scientific support, and that potentially overlook "hazards from human and environmental exposure." *See* Eckstein, 23 N.Y.U. Envtl. L.J. at 65. For example, FDA does not require an EA for any drug whose projected residue concentrations are below one part per billion when entering the environment, 21 C.F.R. § 25.31(b). But drugs such as estrogen and trebolone metabolites have a detrimental impact on aquatic species at detection levels a thousand times smaller than FDA's threshold.[6] Eckstein, 23 N.Y.U. Envtl. L. J. at 65 n.127; *see also* Nidel, 58 Food & Drug L.J. at 93. ("This [CE], which relies on extremely limited

---

[6] In March 2016, FDA released new nonbinding guidance in which the agency appears to hedge its bets in regulating these drugs. Without changing the regulatory language, 21 C.F.R. § 25.31(b), FDA now suggests that it will consider scientific data showing whether levels below one part per billion "produce developmental or reproductive effects in the aquatic environment" to determine whether an EA is necessary. Food & Drug Admin., *Environmental Assessment: Questions and Answers Regarding Drugs with Estrogenic, Androgenic, or Thyroid Activity* 4, *available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatory information/guidances/ucm444657.pdf.

predicative estimates, creates a loophole for many of the low-level compounds discharged into the environment").

Indeed, in response to information that sewage treatment plants do not effectively remove pharmaceuticals from wastewater, FDA, in 2002, noted that it may need to increase its focus on the environmental effects of pharmaceuticals during the drug approval process. *See* Andrew Revkin, *F.D.A. Considers New Tests for Environmental Effects*, New York Times (Mar. 14, 2002) (interviewing Dr. Steven Galson, then-Deputy Director of FDA Center for Drug Evaluation and Research). Yet, over a decade later, FDA still appears not to appreciate the extent that animal drugs affect the environment, beyond direct impacts to the target animal. *See* Octavia Conerly & Lesley Vazquez Coriano, U.S. Envtl. Prot. Agency, Literature Review of Contaminants in Livestock and Poultry Manure and Implications for Water Quality vi, EPA 820-R-13-002 (2013), *available at* http://water.epa.gov/scitech/cec/upload/Literature-Review-of-Contaminants-in-Livestock-and-Poultry-Manure-and-Implications-for-Water-Quality.pdf (acknowledging the need to more fully understand the impact on cropland from exposure to hormones from animal manure).

In short, the lack of transparency and public participation in FDA's drug approval process, combined with the agency's poor record in anticipating and responding to environmental impacts, frustrates NEPA. To ensure meaningful

compliance with NEPA, the public must be able to seek judicial review as soon after FDA approves a drug as possible. Yet, the District Court Order requires the public to engage first in a *post hoc* citizen petition exhaustion process—which FDA devised without considering how the process would affect its NEPA obligations—before asking for judicial oversight.

## II.    FDA's Citizen Petition Exhaustion Process Does Not Provide Adequate Relief of NEPA Claims.

Should this Court require Plaintiffs to exhaust FDA's administrative remedies, Plaintiffs will not find adequate relief through the citizen petition process. Even if the citizen petition persuades FDA to act, the agency's only option is to initiate a drug withdrawal proceeding, and it may only withdraw a drug if it finds the drug unsafe to human health or the health of the target animal. In other words, while FDA could consider a drug's environmental effects during an approval proceeding, it is barred from considering such effects during a withdrawal proceeding. Only through judicial review of the original approval proceeding can Plaintiffs obtain the relief they seek—vacatur and remand of FDA's initial drug approval for failure to comply with NEPA.

### A.    FDA did not contemplate NEPA when it developed the citizen petition process.

The citizen petition process is not a good fit for presenting environmental concerns in order to administratively exhaust a NEPA claim, because that is not

what FDA designed the citizen petition to do. FDA developed its citizen petition regulations for drug approvals *without ever contemplating* how NEPA would apply. The proposed and final rules for FDA's citizen petition process make no mention of NEPA, implying that the citizen petition process was not developed with NEPA in mind. *See*, *e.g.*, Food & Drug Admin., Admin. Practices and Procedures, 40 Fed. Reg. 22,957 (May 27, 1975) (codified at 21 C.F.R. pt. 10.45) (proposing FDA's exhaustion requirement "pursuant to," and "in accordance with," the APA, 5 U.S.C. § 701 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201, but not NEPA).

In fact, when FDA included an example citizen petition in its early regulations, the agency included language that explained the petition was pursuant to "statutory provision[s] for which authority has been delegated to the Commissioner of Food and Drugs," cross-referencing then-regulation 21 C.F.R. § 5.1. *See* 44 Fed. Reg. 22,318, 22,326 (Apr. 13, 1978). That regulatory provision included numerous statutes as "Delegations of Authority to the Commissioner of Food and Drugs," including, *inter alia*, the Food, Drug, and Cosmetic Act, the Caustic Poison Act, and the Import Milk Act. *See* 66 Fed. Reg. 30,992, 30,993 (Jun. 8, 2001) (revising part 5 to move "Delegations of Authority to the Commissioner" to 21 C.F.R. § 5.10); *id.* at 30,994-97. NEPA was not one of

statutes listed, *id.*, indicating that NEPA was not in FDA's mind when the agency developed the citizen petition process.

## B. Challenges to initial drug approvals are distinct from subsequent requests to withdraw or suspend approvals.

The District Court ruling mistakenly claims that "[t]he FDA citizen petition process grants [P]laintiffs a meaningful opportunity to comment on the FDA approvals, and allows the FDA an opportunity to correct any mistakes it made in the approval process prior to possible judicial intervention." District Court Order 11; *id.* at 13-14 (concluding "the agency may withdraw/vacate the FDA approvals—the remedy sought by plaintiffs—should it conclude that new evidence or changed circumstances require new NEPA review"). The court mischaracterizes "the remedy sought by the [P]laintiffs." *Amici* do not read Plaintiffs to ask FDA to "withdraw/vacate" *approved* drugs under 21 U.S.C. § 360b(e)(1); rather, Plaintiffs request that the court vacate and remand FDA's *initial* drug approval decisions, made pursuant to 21 U.S.C. § 360b(b), for failure to comply with NEPA. *See* Appellants' Br. 25 (describing how citizen petition initiates new administrative proceedings). As Plaintiffs explained in briefing before the District Court:

> Plaintiffs do not challenge FDA's approvals under the [] FDCA or seek to suspend or withdraw those approvals. Rather, Plaintiffs challenge FDA's failure to comply with NEPA prior to approvals. If the Court finds FDA failed to comply with NEPA, Plaintiffs request the Court declare FDA violated the law, vacate the approvals pending NEPA compliance, and enjoin the use of the products as necessary to protect human health and the environment.

Pls.' Opp'n to Intervenor-Def.'s Mot. to Dismiss 6, *Ctr. for Food Safety, et al. v. Hamburg, et al.*, 14-cv-04932, 04933, Dkt. No. 60 (N.D. Cal. 2015).

## C. The options available to FDA in response to a citizen petition do not sufficiently include NEPA issues.

In response to a citizen petition, FDA cannot revisit its initial drug approval decisions based on new NEPA-generated information; instead, the agency is confined to the narrow scope of a withdrawal proceeding. In withdrawal proceedings, FDA may act only on information directly related to human or target animal safety, or the effectiveness of the drug.[7] *See* 21 U.S.C. § 360b(e). In contrast, FDA may refuse to approve an *initial* drug application if the applicant "fails to submit an adequate environmental assessment . . . or fails to provide sufficient information to establish that the requested action is subject to categorical exclusion." *Id*. § 514.111(a)(9); *see* 62 Fed. Reg. at 40,572 (noting an "adequate" EA "contains sufficient information to enable the agency to determine whether the proposed action may significantly affect the quality of the human environment").

Because FDA cannot review environmental concerns during a withdrawal proceeding, the citizen petition process cannot lead FDA to consider information raised in this lawsuit, such as the harmful effects that ractopamine imposes on

---

[7] Under FDA regulations, the agency may also withdraw a drug, if elements of the drug applicants' recordkeeping system, production methods, or labeling scheme are inadequate, false, or misleading. *See* 21 C.F.R. § 514.115(c).

water quality and aquatic ecology.[8] *See* Compl. ¶ 59, *Ctr. for Food Safety, et al. v. Hamburg, et al.*, 14-cv-04932, 04933, Dkt. No. 1 (N.D. Cal. 2015) (noting that runoff from land fertilized with manure from treated animals may leach into the soil and groundwater and alter the chemical composition of waterways). Nor can FDA address the drug sponsor's admission that ractopamine is moderately toxic to plants and slightly toxic to aquatic invertebrates. *Id.* ¶ 65.

The withdrawal proceeding is inadequate to address NEPA concerns for another reason: once the agency seeks to withdraw an approved drug, the drug applicant has an implied right to keep the drug on the market, tainting what should be an objective evaluation under NEPA. *Compare* 21 U.S.C. § 360b(e)(1) (giving applicant "due notice and opportunity for hearing" prior to withdrawal) *with Metcalf*, 214 F.3d at 1142 (requiring objective agency NEPA evaluation of projects). In an initial approval proceeding, the applicant has the burden to establish safety; in a withdrawal proceeding, by contrast, the burden weighs on the drug challenger. *Compare* 21 C.F.R. §§ 514.100, 514.111 *with id.* § 514.115.

---

[8] FDA regulation 21 C.F.R. § 25.52(b), which FDA referenced in its District Court briefing to contend that environmental concerns may relate to a withdrawal action, does not alter this analysis. First, section 25.52 only allows for public comment on *EISs* that FDA prepares—and most often, as happened here, FDA stops well short of an EIS. Second, even if comments on an EIS allow FDA to "consider beginning an action to" withdraw a drug, *id.*, FDA may only withdraw the drug within the contours of the statute. And the Food, Drug, and Cosmetic Act does not allow withdrawal based on environmental concerns beyond the safety of humans and target animals. *See* 21 U.S.C. § 360b(e).

In addition, FDA avoids initiating withdrawals because it finds withdrawal hearings inefficient and onerous. In retracting a notice for a withdrawal hearing for approved uses of penicillin and tetracycline in animal feed, FDA stated:

> FDA's experience with contested, formal withdrawal proceedings is that the process can consume extensive periods of time and significant amounts of Agency resources. For example, when FDA withdrew a class of animal drugs called nitrofurans in 1991, the proceedings took nearly 20 years. In another proceeding, the withdrawal of diethylstilbestrol ("DES") in animals became final in 1979, 7 years after issuance of an NOOH. More recently, the withdrawal of enrofloxacin for use in poultry took almost 5 years and cost FDA approximately $3.3 million.

Withdrawal of Notices of Opportunity for a Hearing; Penicillin and Tetracycline Used in Animal Feed, 76 Fed. Reg. 79,697, 79,700 n.8. (Dec. 22, 2011). Thus, even when a citizen petition presents concerns that FDA *can* act on, FDA may still refuse to initiate withdrawal proceedings.[9]

---

[9] FDA has claimed its authority to initiate withdrawal hearings as discretionary. *See NRDC v. FDA*, 760 F.3d 151, 174 (2d Cir. 2014) (finding FDA has discretion in deciding whether to initiate withdrawal, even when FDA has expressed scientific concerns over the safety of an animal drug); *see also* Letter from Michael R. Taylor, FDA to Paige M. Tomaselli, Ctr. for Food Safety ("CFS") & David Wallinga, M.D., Inst. for Agric. & Trade Pol'y, Sept. 30, 2013, Dkt. No. FDA-2009-P-0594, *available at regulations.gov* (refusing to act on citizen petition for arsenic-containing compound nitarsone because, "as a matter of science and regulatory policy," it is more appropriate to pursue scientific research and evaluation instead of initiating a withdrawal hearing). Further, FDA's aversion to initiating withdrawal proceedings is used as a basis to deny citizen petitions. *See NRDC v. FDA*, 872 F. Supp. 2d 318, 324 (S.D.N.Y. 2012), *rev'd*, 760 F.3d 151 (2d Cir. 2014) (denying citizen petition "based, in part, on the Agency's experience with contested, formal withdrawal proceedings which can consume extensive periods of time and Agency resources").

**D.      Plaintiffs can obtain relief only via immediate judicial review.**

In contrast to an FDA withdrawal proceeding, the district court in a typical NEPA lawsuit can vacate and remand agency action "not in accordance with law." 5 U.S.C. § 706(2); *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184-85 (9th Cir. 2011) (noting this Circuit has "directed or upheld setting aside agency action pending NEPA compliance on numerous occasions" because if courts could not stop an agency from taking action without adherence to required procedures, "both NEPA and the APA would be toothless"); *Sierra Club v. Penfold*, 857 F.2d 1307, 1322 (9th Cir. 1988) (holding that the district court properly retained jurisdiction to review adequacy of an EIS, prior to reviewing the agency's cumulative impact studies, because, in part, "the adequacy of the administrative remedy is questionable"). Thus, a court's vacatur and remand of the initial approval, allowing FDA to cure NEPA violations, is the *only* means through which the agency can objectively review environmental impacts that it previously failed to consider, without the constraints imposed by a withdrawal proceeding. *Compare* 21 C.F.R. § 514.111 *with id.* § 514.115.

Because an FDA withdrawal proceeding cannot provide such relief, exhaustion is futile. *See Fones4All Corp. v. FCC*, 550 F.3d 811, 817 (9th Cir. 2008) ("Exhaustion of administrative remedies is not required where

administrative remedies are inadequate or not efficacious, [or] where pursuit of administrative remedies would be a futile gesture"); *Humane Soc'y*, 797 F.3d at 10-11 (holding that exhaustion is not required when available administrative remedies do not offer adequate relief). The District Court Order's exhaustion requirement would effectively insulate drug approvals from FDA's NEPA obligations. Congress surely did not intend such a result. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) ("It would be incongruous with . . . the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored . . . simply because the relevant proposal has received initial approval").

## III. The District Court's Decision Allows FDA to Continue to Violate NEPA without Judicial Oversight.

The citizen petition process, when combined with a closed-door FDA drug approval process, interferes with NEPA's action-forcing purpose and forecloses opportunity for meaningful public participation. FDA can, and usually does, defer acting on citizen petitions for years. And, if FDA does respond to a NEPA-related petition, the agency often does not squarely address its substance. FDA's citizen petition requirement relegates NEPA concerns to *post hoc* busywork, all the while allowing environmentally risky drugs to remain on the market.

## A. The citizen petition requirement exacerbates the environmental review shortcomings inherent in the drug approval process.

In this case, FDA's NEPA review of ractopamine drug approvals appears to have been very minimal. Plaintiffs' allegations describe, and the Administrative Record suggests, a failure to "infuse [environmental review] into the [FDA's] ongoing programs and actions." *Marsh*, 490 U.S. at 371 n.14; *see also* AR 01543, 01095 (giving notice of two examples of many ractopamine combination drug approvals that the applicant—and, thus, FDA—categorically excluded from environmental review).

Even if, *arguendo*, FDA could address NEPA concerns in response to a citizen petition, FDA systematically delays its review of the petitions, thus making the petition process less meaningful from a NEPA compliance standpoint. *See Citizens for Better Forestry*, 341 F.3d at 970-71 ("Th[e] wholesale neglect of [NEPA's] mandatory inclusion of the public in the process . . . undermines the very purpose of NEPA, which is to ensure that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public"). The delay inherent in FDA's responses to petitions ensures that, were the citizen petition requirement apply to NEPA concerns, NEPA review would not occur "early enough" to "serve practically as an important contribution" to agency action. *See WildWest Inst. v. Bull*, 547 F.3d 1162, 1165-66 (9th Cir. 2008) (quoting *Metcalf*, 214 F.3d at 1143).

FDA has no obligation to timely adjudicate a citizen petition and must provide only a "tentative" answer within 180 days. 21 C.F.R. § 10.30(e)(2)(iii). In practice, after 180 days, FDA typically issues a boilerplate response saying it "will require additional time to issue a final response," and then leaves citizen petitions unanswered for lengthy periods of time. For example, in 1999 and 2005, public interest plaintiffs filed separate citizen petitions with FDA to "rescind approvals for subtherapeutic uses" of antibiotics for livestock. *NRDC*, 872 F. Supp. 2d at 324, *rev'd*, 760 F.3d 151 (2d Cir. 2014). FDA did not issue a final response to either citizen petition until after plaintiffs filed suit for unreasonable delay in 2011. *Id*. at 329-30 (amounting to a twelve-year and six-year delay in responding to each respective citizen petition); *see also* Compl., *Inst. for Fisheries Res. et al. v. Burwell*, 4:16-cv-01574-KAW, Dkt. No. 1 (N.D. Cal 2016) (explaining FDA took over four years to issue a November 2015 denial of a May 2011 citizen petition concerning FDA's approval of genetically engineered salmon); *Pub. Citizen v. Heckler*, 602 F. Supp. 611, 613 (D.D.C. 1985) (finding FDA explanation for its delay responding to petition seeking ban of raw milk was "lame at best and irresponsible at worst"); Office of Inspector Gen., Dep't of Health & Human Servs., Report No. A-15-97-50002, *Review of the Food & Drug Administration's Citizen Petition Process* i (Jul. 1998), *available at*

https://oig.hhs.gov/oas/reports/phs/c9750002.pdf (finding that the "FDA does not have an effective process for handling citizen petitions in a timely manner . . .").[10]

Indeed, FDA's *modus operandi* of delaying its responses to citizen petitions has already occurred with ractopamine-related petitions. In December 2012, two of the plaintiffs in this case filed a citizen petition asking FDA to revise the allowable ractopamine residue levels in meat, based on an international standard established in July 2012. *See* Petition, CFS & ALDF to FDA, Docket No. FDA-2012-P-1252, Dec. 20, 2012, *available at* regulations.gov. In June 2013, FDA issued its boilerplate 180-day interim response. *See* Interim Response, FDA to CFS & ALDF, Docket No. FDA-2012-P-1252, Jun. 10, 2012, *available at* regulations.gov. After more than three years of delay, FDA has yet to respond.

Given FDA's poor track record in responding to citizen petitions, Plaintiffs should not be surprised when—if forced to first file a citizen petition, as the District Court Order requires—the agency places their environmental concerns on the administrative shelf for years, exacerbating FDA's procedural NEPA violations. *See Citizens for Better Forestry*, 341 F.3d at 970-71.

---

[10] Even if a citizen petitioner navigates the years-long petition process and persuades FDA to commence a withdrawal or suspension proceeding, the agency's withdrawal proceeding will likely take *even more* years. *See, e.g.*, 76 Fed. Reg. at 79,700 n.8. (discussing how Nitrofuran drug withdrawal, proposed in 1971, was finally completed in 1991).

## B. FDA does not incorporate NEPA-related citizen petitions into its decision-making process.

When FDA finally answers a NEPA-oriented citizen petition, FDA does not respond in a meaningful way. Public interest groups have attempted to use the citizen petition process to raise NEPA concerns, but have not received meaningful relief. Rather than engaging directly with citizen petitioners' NEPA concerns, FDA dismisses the petitions, citing NEPA decisions made in the context of the parallel rulemakings and substantive decisions. FDA treats the citizen petition process as collateral to the initial approval decisions, which shows that *even FDA believes* that the citizen petition process is not an effective vehicle for NEPA compliance. It is, therefore, absurd that those NEPA decisions would themselves be insulated from judicial review on the ground that the citizen petition option exists.

FDA's response to genetically engineered salmon petitions illustrates the agency's approach. Public interest groups filed petitions in 2001 and 2011, referencing NEPA and expressing environmental concerns—the first requested a moratorium on the raising of genetically engineered fish, and the second asked FDA to refrain from approving a new animal drug application AquAdvantage Salmon until the agency understood the environmental effects of the approval and associated actions. *See* Acknowledgement Letter, FDA to CFS, Dkt. No. FDA-2001-P-0483-0002 (referencing then-Docket No. O1P-0230), May 11, 2001, *available at* regulations.gov; Petition, Ocean Conservancy, *et al.* to FDA, Docket

No. FDA-2011-P-0448, May 25, 2011, *available at* regulations.gov. Eight years later, FDA dismissed the 2001 petition, relying on separate agency guidance on genetically engineered fish that the agency issued one day prior to dismissing the petition. *See* Petition Denial, FDA Office for Policy Response to CFS, Docket. No. FDA-2001-P-0483-0008, Jan. 15, 2009, *available at* regulations.gov. Yet, FDA did not reference the citizen petition anywhere in its guidance document. *Id.*

Similarly, in 2015, FDA dismissed the 2011 citizen petition on the same day that the agency approved the AquAdvantage Salmon drug application, pointing to the agency's post-petition EA as the rationale for its petition denial. *See* Petition Denial, FDA to Earthjustice at 2 n.2, Docket No. FDA-2011-P-0448, Nov. 19, 2015, *available at* regulations.gov (describing agency's December 2012 draft EA). Yet FDA processed the 2011 citizen petition and 2012 draft EA on separate and disconnected dockets. *Compare* Citizen Petition Denial Letter, Docket No. FDA-2011-P-0448, Nov. 19, 2015, *available at* regulations.gov (responding to citizen petition filed May 25, 2011) *with* 77 Fed. Reg. 76,050 (Dec. 26, 2012) (publishing draft EA as docket FDA-2011-N-0899).

The citizen petition process, thus, appears to be little more than pretext for FDA to delay response to citizens' NEPA concerns, long after the agency has committed resources to an approval that has already occurred. *See Metcalf*, 214 F.3d at 1143-44 (explaining that by failing to perform objective environmental

review *before* acting, agency unlawfully made an "irreversible and irretrievable commitment of resources").

### C. The delay from FDA's citizen petition barrier allows ecologically risky drugs to remain in the environment.

Because FDA takes years, if not decades, to respond to a citizen petition, the District Court allows potentially damaging drugs to remain on the market and enter the environment. *See* 21 C.F.R. § 10.35(d) (noting that citizen petition does not automatically stay an administrative action). In contrast, in reviewing NEPA claims, courts may—and often do—enjoin procedural violations to avoid risk of irreparable harm. *See*, *e.g.*, *S. Fork Band Council of W. Shoshone of Nev. v. Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (holding, in a NEPA case, that suspension of project with a high likelihood of irreparable environmental injury, without adequate study of the adverse effects, comports with the public interest). Judicial backstop protections fly out the window, if those with NEPA concerns, like Plaintiffs, must engage in a lengthy, and meaningless, administrative process.

FDA is no stranger to allowing controversial animal drugs to remain in use while citizen petitions are pending. For decades, FDA continued to allow widespread use of arsenicals in poultry feed to remain on the market in the face of public uproar and citizen petitions. *See* Schneider, *Beyond the Food We Eat,* 25 Duke Envtl. L. & Pol'y F. at 252-53. In fact, FDA allowed the use of arsenicals, even after EPA prohibited the use of arsenical roxarsone as a pesticide. *Id*. By

2006, environmental deterioration from arsenicals became impossible to ignore: as industry fed more broiler chickens feed containing arsenic compounds, trace amounts of arsenic appeared in poultry feathers, bedding, and manure. Ultimately, arsenic entered croplands and appeared at high levels in rice. *Id*. In 2009, advocacy groups filed a petition asking FDA to "immediately suspend the approval of all [animal drugs] for arsenic-containing compounds used as feed additives for food animals." Petition, CFS & Inst. for Agric. and Trade Policy, Docket No. FDA-2009-P-0594, Dec. 8, 2009, *available at* regulations.gov. FDA sat on the petition for years. After petitioners brought an unreasonable delay claim in April 2013 *and* after the industry drug applicants voluntarily withdrew their drugs from the market, FDA withdrew approval of three of the four arsenicals approved for use in animal feed. Susan Schneider, *Examining Food Safety from a Food Systems Perspective*, 2014 Wis. L. Rev. 397, 409 & n.69 (2014).

Like arsenicals, ractopamine threatens the environment by entering soil and waterways. The material safety data sheets for ractopamine show that, in addition to health issues associated with target animals and humans, the drug is causing harm to aquatic invertebrates and plants. *See* CFS Compl., *CFS v. FDA*, 4:14-cv-04932, Dkt. No. 1 ¶¶ 56-67 (N.D. Cal. 2014). Moreover, environmental harms are likely more extensive than currently acknowledged because the drug applicants grossly underestimated the amount of the drug that would be released into the

environment. *Compare id.* (showing recent market penetration of 80 percent of pig producers) *with* Food & Drug Admin., *Paylean Environmental Assessment*, http://www.fda.gov/downloads/AnimalVeterinary/DevelopmentApprovalProcess/Environmental Assessments/UCM072246.pdf (showing Elanco's prediction that ractopamine use would result in an "optimistic market penetration of 30%").

While FDA refuses, on its own, to acknowledge the potentially destructive impacts that ractopamine risks to the environment, the District Court Order's requirement of administrative exhaustion through a citizen petition will foreclose meaningful relief and lead to years—even decades—of bureaucratic delay. Only judicial relief, forcing FDA to comply with NEPA, can protect the public from irreparable environmental harm. *See S. Fork Band*, 588 F.3d at 728.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court Order and remand Plaintiffs' claims to the District Court for a decision on the merits.

*/s/ Daniel H. Lutz*                                      Dated: May 17, 2016
Daniel H. Lutz
Hope M. Babcock

INSTITUTE FOR PUBLIC REPRESENTATION
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9535
daniel.lutz@law.georgetown.edu                    Counsel for *Amici Curiae*

**ADDENDUM**

**IDENTITY OF *AMICI CURIAE***

- **Alberto Alemanno**, Global Clinical Professor of Law
  New York University School of Law

- **William Araiza**, Vice Dean & Professor of Law
  Brooklyn Law School

- **Michael Blumm**, Jeffrey Bain Faculty Scholar & Professor of Law
  Lewis & Clark Law School

- **William W. Buzbee**, Professor of Law
  Georgetown University Law Center

- **Fred Cheever**, Professor of Law
  University of Denver Sturm College of Law

- **Lisa Heinzerling**, Justice William J. Brennan, Jr. Professor of Law
  Georgetown University Law Center

- **Oliver A. Houck**, Professor of Law
  Tulane University Law School

- **Guadalupe T. Luna**, Professor of Law
  Indiana Tech University Law School

- **Thomas O. McGarity**, Joe R. & Teresa Lozano Long Endowed Chair
  in Administrative Law
  University of Texas School of Law

- **Zygmunt J.B. Plater**, Professor of Law
  Boston College Law School

**(cont'd)**

- **Margot J. Pollans**, Assistant Professor of Law
  Elizabeth Haub School of Law at Pace University

- **Gabriela Steier**, Adjunct Professor
  Duquesne University School of Law

- **Gerald Torres**, Jane M.G. Foster Professor of Law
  Cornell Law School

- **Pamela Vesilind**, Adjunct Professor
  Vermont Law School

- **Wendy E. Wagner**, Joe A. Worsham Centennial Professor of Law
  University of Texas School of Law

**CERTIFICATE OF COMPLIANCE PURSUANT TO
FED. R. APP. P. 29(d) & 32(a)(7) AND NINTH CIRCUIT RULES**

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7), the

attached Brief of *Amici Curiae* Environmental, Administrative, and Food Law

Professors is proportionally spaced, has a typeface of 14 point Times New Roman,

and contains 6,176 words.

I further certify that all privacy redactions have been made.

I further certify that all paper copies submitted to this Court are exact copies

of this version, which is being submitted electronically via the Court's CM/ECF

system.

I further certify that the electronic submission was scanned for viruses with

the most recent version of a commercial virus scanning program and is free of

viruses.


/s/ Daniel H. Lutz                                             Dated: May 17, 2016

Daniel H. Lutz
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9535
daniel.lutz@law.georgetown.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2015, I electronically filed the foregoing

Brief of *Amici Curiae* Environmental, Administrative, and Food Law Professors,

with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit

by using the Court's CM/ECF system. I further certify that all parties are

represented by counsel registered with the CM/ECF system, so that service will be

accomplished by the CM/ECF system.

/s/ Daniel H. Lutz                                          Dated: May 17, 2016

Daniel H. Lutz
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9535
daniel.lutz@law.georgetown.edu